******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

# NORTH SAILS GROUP, LLC *v.* BOARDS
## AND MORE GMBH ET AL.
### (SC 20338)

Robinson, C. J., and Palmer, McDonald, D'Auria,
Mullins, Kahn and Ecker, Js.*

*Syllabus*

The plaintiff, N Co., sought to recover damages from the defendants, B Co. and E Co., for breach of a trademark licensing agreement, pursuant to which B Co. was granted a worldwide license to use N Co.'s trade name and certain of its trademarks in connection with certain products B Co. manufactured. N Co. is a Delaware company with its principal place of business in Connecticut, whereas B Co. and E Co. have their principal places of business in Austria and Germany, respectively. From 1990 to 2000, N Co. and B Co.'s predecessor were parties to a prior version of the licensing agreement. In 2000, after a period of negotiations during which B Co. sent various communications to N Co. in Connecticut, B Co. and N Co. executed a new licensing agreement, which continued from year to year until terminated. Pursuant to that agreement, B Co. agreed to maximize the production, marketing and sale of the licensed products and to send N Co. royalty payments at a bank in Wisconsin. The agreement also contained a choice of law provision designating Wisconsin law as controlling the agreement, but the agreement did not require that B Co. perform any of its contractual obligations in Connecticut. N Co. alleged that, in 2018, B Co., at the direction of E Co., violated the licensing agreement by launching its own trademark, which it used to replace N Co.'s trademarks for use with the licensed products. The trial court granted the defendants' motion to dismiss for lack of personal jurisdiction and rendered judgment for the defendants. That court concluded that, because the defendants' alleged actions occurred in Europe, the defendants lacked sufficient minimum contacts with Connecticut such that the exercise of personal jurisdiction over them would offend principles of due process. On the plaintiff's appeal, *held* that the trial court correctly determined that the exercise of personal jurisdiction over the defendants would violate due process, as N Co. failed to establish that B Co., by virtue of its long-term contractual relationship with N Co., had sufficient minimum contacts with Connecticut, and, accordingly, properly granted the defendants' motion to dismiss: considering the totality of the circumstances, including prior negotiations, contemplated future consequences, the terms of the parties' contract and the parties' actual course of dealing, this court could not conclude that B Co. had purposefully availed itself of the benefits of doing business in Connecticut such that it should have been foreseeable that it could be sued in this state, especially when the licensing agreement did not envision an interactive, highly regulated relationship or anticipate a relationship for a specific amount of time; moreover, despite the nearly twenty year business relationship between B Co. and N Co., there was no evidence that either B Co. or its predecessor initiated contact with N Co. in Connecticut, and B Co.'s purposeful contact with the forum was limited to a single visit to Connecticut by its chief executive officer in 2003 and occasional communications sent to N Co. in Connecticut that were ancillary to the performance of the contract, rather than demonstrative of continuous collaboration between the parties, such that N Co. did not establish that, during the course of their relationship, B Co. had contacts with or continuing obligations in Connecticut; furthermore, B Co.'s physical presence in Connecticut was insubstantial and sporadic, it did not conduct business or maintain offices, employees, property or an agent for service of process in Connecticut, aside from the chief executive officer's single visit to Connecticut, all meetings and negotiations between representatives of N Co. and B Co. and its predecessor occurred in Europe or states other than Connecticut, and the fact that B Co. knew that N Co. would perform its contractual obligations in Connecticut was of no consequence, as it is well established that it is the forum contacts of a defendant, not a

plaintiff, that are relevant to the minimum contacts analysis; in addition, the licensing agreement did not contemplate performance in Connecticut but, rather, drew a connection to Wisconsin via its choice of law provision and by requiring that B Co. send royalty payments to a bank located there, and, although the licensing agreement gave N Co. certain oversight over B Co.'s production of the licensed products, including the rights to receive samples of and to inspect the products and quality control test data, the parties' course of dealing called into question the extent to which N Co. exercised those limited rights.

*(Two justices dissenting in one opinion)*

Argued November 15, 2019—officially released August 20, 2021**

*Procedural History*

Action to recover damages for, inter alia, breach of contract, and for other relief, brought to the Superior Court in the judicial district of New Haven and transferred to the Complex Litigation Docket; thereafter, the case was transferred to the judicial district of Hartford, Complex Litigation Docket, where the court, *Moukawsher, J.*, granted the defendants' motion to dismiss and rendered judgment thereon, from which the plaintiff appealed. *Affirmed.*

*Jeffrey R. Babbin*, with whom were *Ariela C. Anhalt, Adam S. Lurie*, pro hac vice, and, on the brief, *Kate Z. Machan*, pro hac vice, for the appellant (plaintiff).

*Christopher J. Gaspar*, pro hac vice, with whom were *John W. Cerreta* and, on the brief, *Bryan J. Orticelli*, for the appellees (defendants).

*Jeffrey J. White* and *Denis J. O'Malley* filed a brief for the Connecticut Business and Industry Association as amicus curiae.

*Opinion*

D'AURIA, J. This appeal requires us to consider whether, consistent with due process, a court of this state may properly exercise personal jurisdiction over the foreign national defendant in this breach of contract action when the resident plaintiff has alleged that its long-term, contractual relationship with the defendant created sufficient minimum contacts with Connecticut. The plaintiff, North Sails Group, LLC, appeals from the judgment of dismissal for lack of personal jurisdiction over the defendants, Boards and More GmbH (B&M) and Emeram Capital Partners GmbH (Emeram).[1] The plaintiff claims that the trial court improperly concluded that exercising personal jurisdiction over the defendants would violate their right to due process. Although we recognize that this is a close case, we conclude that the plaintiff has failed to demonstrate that the defendants had sufficient minimum contacts with Connecticut, and, thus, we affirm the judgment of the trial court.

"A motion to dismiss tests, inter alia, whether, on the face of the record, the court is without jurisdiction." (Internal quotation marks omitted.) *Dorry* v. *Garden*, 313 Conn. 516, 521, 98 A.3d 55 (2014). "Because a jurisdictional challenge presents a question of law, our review is plenary." *Samelko* v. *Kingstone Ins. Co.*, 329 Conn. 249, 257, 184 A.3d 741 (2018). When, as in the present case, "the defendant challenging the court's personal jurisdiction is a foreign corporation or a nonresident individual, it is the plaintiff's burden to prove the court's jurisdiction." *Cogswell* v. *American Transit Ins. Co.*, 282 Conn. 505, 515, 923 A.2d 638 (2007). In deciding a jurisdictional question raised by a motion to dismiss, a court must "take the facts to be those alleged in the complaint, including those facts necessarily implied from the allegations, construing them in a manner most favorable to the pleader." (Internal quotation marks omitted.) *Dorry* v. *Garden*, supra, 521. In most instances, the motion must be decided on the complaint alone. However, when "the complaint is supplemented by undisputed facts established by affidavits submitted in support of the motion to dismiss . . . the trial court, in determining the jurisdictional issue, may consider these supplementary undisputed facts and need not conclusively presume the validity of the allegations of the complaint. . . . Rather, those allegations are tempered by the light shed on them by the [supplementary undisputed facts]. . . . If affidavits and/or other evidence submitted in support of a defendant's motion to dismiss conclusively establish that jurisdiction is lacking, and the plaintiff fails to undermine this conclusion with counteraffidavits . . . or other evidence, the trial court may dismiss the action without further proceedings. . . . If, however, the defendant submits either no proof to rebut the plaintiff's jurisdictional allegations

. . . or only evidence that fails to call those allegations into question . . . the plaintiff need not supply counteraffidavits or other evidence to support the complaint . . . but may rest on the jurisdictional allegations therein." (Internal quotation marks omitted.) *Angersola* v. *Radiologic Associates of Middletown, P.C.*, 330 Conn. 251, 274–75, 193 A.3d 520 (2018).

In the present case, there are no disputed facts relevant to our minimum contacts analysis. Rather, the court's task is to determine whether the plaintiff has advanced sufficient allegations and evidence to establish minimum contacts. If it has not, the plaintiff simply has not met its burden.

Consistent with these principles, we consider the following facts as alleged in the complaint and those facts contained in the affidavits and exhibits submitted in support of the defendants' motion to dismiss and the plaintiff's opposition thereto, none of which creates a dispute regarding a relevant jurisdictional fact. The plaintiff is a limited liability company registered in Delaware, with its principal place of business in Milford, Connecticut. B&M is a limited liability company chartered under the laws of Austria, with its principal place of business in Molln, Austria. Emeram is a private equity investment limited liability company, with its principal place of business in Munich, Germany. Neither B&M nor Emeram has ever appointed or maintained an agent for service of process in Connecticut. Neither of the defendants maintains any offices, employees, or real or personal property, including computers, in Connecticut; nor do they transact any business in Connecticut. B&M's only sales in the United States are to Boards & More, Inc. (B&M USA), an American company incorporated and located in the state of Washington. B&M and B&M USA are sister entities, both wholly owned subsidiaries of Boards and More Beteiligungs GmbH, which, in turn, is a wholly owned subsidiary of Boards and More Holding GmbH, a German limited liability company that is the top level operational business within the Boards and More group of companies.[2]

On October 1, 1990, the plaintiff entered into a trademark licensing agreement with B&M's predecessor, North Sails Windsurfing GmbH (NSW). NSW subsequently assigned all of its interests in the licensing agreement to B&M.[3] On October 1, 2000, the plaintiff and B&M terminated the October 1, 1990 agreement and substituted for it the trademark and licensing agreement that gave rise to the present action (licensing agreement). Pursuant to the licensing agreement, the plaintiff granted B&M a worldwide license to use certain trademarks the plaintiff owned, as well as the trade name, "North Surf," which the plaintiff also owned (collectively, North Marks), in the manufacture and distribution of certain B&M windsurfing, kitesurfing and associated products (licensed products).[4] In exchange, B&M

agreed "to use its best good faith effort to maximize the production, marketing and sale" of the licensed products. B&M also agreed to pay quarterly license fees to a bank account the plaintiff designated—JP Morgan Chase Bank, in Milwaukee, Wisconsin. The licensing agreement provided that it would be governed by and construed in accordance with the laws of the state of Wisconsin, excluding its choice of law rules. The agreement provided that it would continue from year to year until terminated or canceled as a result of one of a number of occurrences listed in § 8 of the agreement. Emeram is not a party to the agreement.[5]

The plaintiff alleges that, as of the date on which the complaint was filed, B&M, at the direction of Emeram and in violation of the licensing agreement, launched its own trademark (B&M trademark) and replaced the North Marks with the B&M trademark for use with the licensed products to be released in the autumn of 2018. The plaintiff claims that the defendants' actions caused it harm because, due to the licensing agreement, B&M had established a global distribution network for the licensed products, while, at the same time, the plaintiff had refrained from manufacturing, producing and distributing any products that would compete with the licensed products. The plaintiff further alleges that, because of insufficient lead time provided by B&M, the plaintiff lacked sufficient time to partner with a competing company to manufacture and to distribute similar North Marks products.

The plaintiff brought this action alleging breach of contract as to both defendants. The trial court subsequently granted the defendants' motion to dismiss for lack of personal jurisdiction, concluding that, although Connecticut's long arm statute, General Statutes § 52-59b, "likely" would support the exercise of jurisdiction, principles of due process would not. Stating that "[t]he current constitutional standard on specific jurisdiction is just a year old," the court concluded that the case was governed by the decision of the United States Supreme Court in *Bristol-Myers Squibb Co*. v. *Superior Court*,    U.S.    , 137 S. Ct. 1773, 198 L. Ed. 2d 395 (2017).[6] Applying *Bristol-Myers Squibb Co.*, the court concluded that, because the actions that allegedly constituted a breach of contract had occurred in Europe, not in Connecticut, the defendants lacked sufficient minimum contacts with Connecticut, and the exercise of personal jurisdiction over them would offend principles of due process. The plaintiff appealed from the trial court's judgment to the Appellate Court, and the appeal was transferred to this court. See General Statutes § 51-199 (c); Practice Book § 65-1.

I

"When a defendant challenges personal jurisdiction in a motion to dismiss, the court must undertake a two part inquiry to determine the propriety of its exercising

such jurisdiction over the defendant. The trial court must first decide whether the applicable state [long arm] statute authorizes the assertion of jurisdiction over the [defendant]. If the statutory requirements [are] met, its second obligation [is] then to decide whether the exercise of jurisdiction over the [defendant] would violate constitutional principles of due process." (Internal quotation marks omitted.) *Samelko* v. *Kingstone Ins. Co.*, supra, 329 Conn. 256. In the present case, because we agree with the trial court that the exercise of personal jurisdiction over the defendants would violate due process, we need not address whether § 52-59b would support the exercise of jurisdiction over them.[7]

We must determine whether this court may constitutionally exercise specific jurisdiction over B&M by virtue of the contract between the plaintiff and B&M. See footnote 5 of this opinion. For a forum state to exercise personal jurisdiction over a nonresident defendant, due process requires that the defendant must "have certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." (Internal quotation marks omitted.) *International Shoe Co.* v. *Washington*, 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95 (1945). The United States Supreme Court has recognized two forms of personal jurisdiction: general and specific. The present case involves only specific jurisdiction, which requires that the plaintiff demonstrate both that B&M has minimum contacts with the forum and that the lawsuit arises out of or relates to those contacts. See *Bristol-Myers Squibb Co.* v. *Superior Court of California*, supra, 137 S. Ct. 1780.[8] "Once it has been decided that a defendant purposefully established minimum contacts within the forum [s]tate, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with fair play and substantial justice." (Internal quotation marks omitted.) *Burger King Corp.* v. *Rudzewicz*, 471 U.S. 462, 476, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985) (*Burger King*).[9]

As explained, it is the plaintiff's burden to establish that a defendant has sufficient minimum contacts with the forum. See, e.g., *Cogswell* v. *American Transit Ins. Co.*, supra, 282 Conn. 515; see also *Bank Brussels Lambert* v. *Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999). The plaintiff's jurisdictional argument rests on its contract with B&M. The United States Supreme Court has stated that "an individual's contract with an out-of-state party alone [cannot] automatically establish sufficient minimum contacts in the other party's home forum . . . ." (Emphasis omitted.) *Burger King Corp.* v. *Rudzewicz*, supra, 471 U.S. 478. Rather, we must evaluate the totality of the circumstances, including "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing . . . in determin-

ing whether the defendant purposefully established minimum contacts within the forum." Id., 479.

It is well established that, in evaluating the totality of the circumstances, it is the defendant's contacts with the forum state, not those of the plaintiff, that are relevant. See, e.g., *Walden* v. *Fiore*, 571 U.S. 277, 284, 134 S. Ct. 1115, 188 L. Ed. 2d 12 (2014) ("[T]he relationship must arise out of contacts that the 'defendant himself' creates with the forum [s]tate. . . . We have consistently rejected attempts to satisfy the defendant-focused 'minimum contacts' inquiry by demonstrating contacts between the plaintiff (or third parties) and the forum [s]tate." (Citations omitted; emphasis omitted.)).[10] In the present case, we conclude that, despite the parties' long-term relationship, the plaintiff has failed to establish that, considering the totality of the circumstances, B&M's contacts with Connecticut weigh in favor of jurisdiction.

### A

The seminal case regarding minimum contacts in a contract dispute, undertaking this totality of the circumstances analysis, is *Burger King*. In *Burger King*, the court concluded that the single contract between the parties, considered with all the attendant circumstances, was sufficient to subject the defendant to specific jurisdiction in the forum state. *Burger King Corp.* v. *Rudzewicz*, supra, 471 U.S. 478–79. The court clarified, however, that "an individual's contract with an out-of-state party *alone* [cannot] automatically establish sufficient minimum contacts in the other party's home forum," rejecting "the notion that personal jurisdiction might turn on 'mechanical' tests . . . ." (Citations omitted; emphasis in original.) Id., 478. To determine whether a single contract suffices to establish the minimum contacts necessary for the exercise of specific jurisdiction over a nonresident defendant, courts review the totality of the circumstances surrounding that relationship to determine whether the defendant, by its actions, purposefully has availed itself of the benefits of the forum state. See, e.g., *Stuart* v. *Spademan*, 772 F.2d 1185, 1192–94 (5th Cir. 1985); id., 1194 (reviewing "the totality of the facts" in determining that parties' interactions leading up to patent assignment agreement did not give rise to sufficient minimum contacts to support exercise of personal jurisdiction); *Combustion Engineering, Inc.* v. *NEI International Combustion, Ltd.*, 798 F. Supp. 100, 105 (D. Conn. 1992) (observing that "due process inquiry rests upon the totality of the circumstances"). Courts have repeatedly rejected reliance on any single factor and instead have examined all aspects of the contractual relationship between the parties, evaluating the "extent, nature, and quality" of the nonresident defendant's contacts with the forum state. *Consulting Engineers Corp.* v. *Geometric Ltd.*, 561 F.3d 273, 281 (4th Cir. 2009); see id., 281–82 (finding no

jurisdiction over nonresident defendant and rejecting claim that choice of law clause providing that forum state's law governed contract was dispositive).

The United States Supreme Court explained in *Burger King* that the goal of the inquiry is to determine whether the contract and its surrounding circumstances demonstrate that the nonresident defendant "reach[ed] out beyond one state and create[d] continuing relationships and obligations with citizens of another state . . . ." (Internal quotation marks omitted.) *Burger King Corp.* v. *Rudzewicz*, supra, 471 U.S. 473. Under those circumstances, the nonresident defendant is understood to have purposefully availed itself of the benefit of its activities in the forum state, and "it may well be unfair to allow [it] to escape having to account in [the forum state] for consequences that arise proximately from such activities; the [d]ue [p]rocess [c]lause may not readily be wielded as a territorial shield to avoid interstate obligations that have been voluntarily assumed." Id., 474. As one court has aptly summarized it, the purposeful availment inquiry "represents a rough quid pro quo: when a defendant deliberately targets its behavior toward the society or economy of a particular forum, the forum should have the power to subject the defendant to judgment regarding that behavior. . . . The cornerstones of this inquiry are voluntariness and foreseeability." (Citation omitted; internal quotation marks omitted.) *C.W. Downer & Co.* v. *Bioriginal Food & Science Corp.*, 771 F.3d 59, 66 (1st Cir. 2014).[11]

The significance to the inquiry of both voluntariness and foreseeability is evident in the court's explanation of the principles underlying the " 'purposeful availment' " requirement; *Burger King Corp.* v. *Rudzewicz*, supra, 471 U.S. 475; which "ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts . . . or of the unilateral activity of another party or a third person . . . . Jurisdiction is proper . . . [when] the contacts proximately result from *actions by the defendant* [*itself*] that create a substantial connection with the forum [s]tate. . . . Thus [when] the defendant deliberately has engaged in significant activities within a [s]tate . . . or has created continuing obligations between [itself] and residents of the forum . . . [it] manifestly has availed [itself] of the privilege of conducting business there, and because [its] activities are shielded by the benefits and protections of the forum's laws it is presumptively not unreasonable to require [it] to submit to the burdens of litigation in that forum as well." (Citations omitted; emphasis added; footnotes omitted; internal quotation marks omitted.) Id., 475–76.

In determining minimum contacts in a contracts case, courts must take a "highly realistic approach that recognizes that a contract is ordinarily but an intermediate step serving to tie up prior business negotiations with

future consequences which themselves are the real object of the business transaction. . . . It is these factors—*prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing*—that must be evaluated in determining whether the defendant purposefully established minimum contacts with the forum." (Citation omitted; emphasis added; internal quotation marks omitted.) Id., 479.

The court's minimum contacts analysis of the single contract at issue in *Burger King* illustrates well the application of these principles. In concluding that the contract between the plaintiff, Burger King, a Florida corporation, and the defendant, a resident of Michigan, created sufficient minimum contacts between the defendant and Florida to support the exercise of jurisdiction over the defendant in Florida, the court considered all of the circumstances surrounding the contractual relationship between the parties. Id., 464–66, 479–80. The court began its analysis with the fact that it was the defendant who initiated contact with Burger King by applying for a franchise in the Detroit, Michigan area. Id., 479. The court viewed that fact as evidencing the purposefulness of the defendant's actions, noting that he "deliberately reach[ed] out beyond Michigan and negotiated with a Florida corporation for the purchase of a long-term franchise and the manifold benefits that would derive from affiliation with a nationwide organization." (Internal quotation marks omitted.) Id., 479–80. During the negotiation period, the defendant had several significant contacts with Burger King—his business partner attended management training courses in Florida, and the defendant and his partner negotiated the proposed franchise agreement not only with Burger King's local Michigan office but also with its corporate headquarters in Miami, Florida. Id., 466–67.

The court also considered it significant that the parties created a "carefully structured [twenty year] relationship that envisioned continuing and [wide reaching] contacts with Burger King in Florida," thus establishing a substantial connection with the forum state. Id., 480. The terms of the contract strengthened that connection. Specifically, in the contract, the defendant agreed to send monthly payments directly to the plaintiff's headquarters in Florida; id.; and "to submit to the national organization's exacting regulation of virtually every conceivable aspect of [his] operations." Id., 465. The contract also provided that the franchise relationship was established in Miami and governed by Florida law. Id., 466. As for the parties' actual course of dealing, the court observed that, although the Michigan office handled the day-to-day monitoring of franchisees; id.; "[w]hen problems arose over building design, [site development] fees, rent computation, and the [defendant's] defaulted payments . . . the Michigan office was powerless to resolve [the] disputes" and could

serve only as an intermediate link to the corporate headquarters in Miami. Id., 481. The court emphasized more than once the significance of the defendant's submission to the "long-term and exacting regulation of his business" by Burger King. Id., 480; see also id., 465. His agreement to submit to the oversight of Burger King provided yet another example of the defendant's connections to the forum state.

The parties' actual course of dealing further reinforced the contacts between the defendant and the forum. Specifically, the court pointed to the "continuous course of direct communications by mail and by telephone" between the parties regarding disputes that arose during the course of the contracting involving building design, site development fees, rent computation, and the defaulted payments. Id., 481. In addition to relying on the sheer quantity and consistency of communications between the parties, the court considered the substance of those communications, which "confirmed that [decision-making] authority was vested in the Miami headquarters . . . ." Id., 480–81.

Significantly, the court in *Burger King* considered *all* of the previously mentioned factors in arriving at its conclusion that the nonresident defendant had sufficient minimum contacts with Florida—no single fact was dispositive. The dissent in the present case, nevertheless, contends that *Burger King* stands for the proposition that there is a distinction between merely entering into a contract and entering into a contractual *relationship*, with the latter creating a "presumpt[ion]" of minimum contacts.[12]

But *Burger King* itself actually rejected such a presumption, beginning its analysis by specifically rejecting a presumption that "an individual's contract with an out-of-state party alone can automatically establish sufficient minimum contacts . . . ." (Emphasis omitted.) Id., 478. The court did not limit this holding to single transaction contracts or exclude long-term contracts but explained that, in all contract cases, the minimum contacts inquiry must focus on the parties' negotiations and contemplated future consequences, the terms of the contract, and the parties' actual course of dealing. Id., 479. Then, in a critical footnote, the court indicated that it was *not* creating a presumption in favor of jurisdiction that was based merely on the existence of a long-term franchise agreement: "We do not mean to suggest that the jurisdictional outcome will always be the same in franchise cases. Some franchises may be primarily intrastate in character or involve different [decision-making] structures, such that a franchisee should not reasonably anticipate out-of-state litigation. . . . For these reasons, we reject Burger King's suggestion for 'a general rule, or at least a presumption, that participation in an interstate franchise relationship' represents consent to the jurisdiction of the franchisor's

principal place of business."[13] (Citation omitted.) Id., 485 n.28. Thus, the United States Supreme Court, in the very case both this majority and the dissent are arguing about, rejected a presumption for long-term franchise agreements that would favor jurisdiction the dissent contends *Burger King* supports. We see no reason why there should be a presumption in favor of jurisdiction for other long-term contractual relationships that the court rejected for franchise relationships, which are arguably long-term in nature.

What then is to be made of the language in *Burger King* that the dissent relies on to argue that "knowingly entering into a long-term contractual relationship with a forum resident presumptively gives rise to the minimum contacts necessary for jurisdiction to attach"? Careful consideration of that portion of the decision in *Burger King* in its proper context yields the answer. The court stated: "[When] the defendant deliberately has engaged in significant activities within a [s]tate . . . or has created continuing obligations between [itself] and residents of the forum . . . [it] manifestly has availed [itself] of the privilege of conducting business there, and because [its] activities are shielded by the benefits and protections of the forum's laws it is presumptively not unreasonable to require [it] to submit to the burdens of litigation in that forum as well." (Citations omitted; internal quotation marks omitted.) *Burger King Corp.* v. *Rudzewicz*, supra, 471 U.S. 475–76. The dissent claims that this language means that, "[w]hen a commercial entity knowingly and voluntarily chooses to become business partners with a resident of a state, and follows through by engaging in a long-term relationship, it necessarily accepts a connection with the state itself— its laws, economy, transportation and communication infrastructure, and other residents—in all sorts of ways, both predictable and unexpected, such that it should reasonably anticipate the possibility that a contract related dispute may be adjudicated by that state's courts."[14] (Emphasis omitted.) This is an inaccurate summary of the quoted language. *Burger King* does not say that voluntarily entering into a long-term contractual relationship creates minimum contacts but, rather, makes clear that minimum contacts exist under those circumstances in which the defendant "has engaged in significant activities within a [s]tate . . . or has created continuing obligations between [itself] and residents of the forum . . . ." (Citations omitted; internal quotation marks omitted.) *Burger King Corp.* v. *Rudzewicz*, supra, 475–76. Although many long-term contractual relationships will result in such continuing obligations, the dissent appears to assume that all long-term contracts presumptively create "obligations between [a defendant] and residents of the forum . . . ." (Internal quotation marks omitted.) Part II A of the dissenting opinion, quoting *Burger King Corp.* v. *Rudzewicz*, supra, 476. Not all long-term contractual relationships

will lead to significant activities within the forum or continuing obligations between the defendant and residents of the forum. If there are such "significant activities" or " 'continuing obligations,' " then the exercise of jurisdiction over the defendant is reasonable. *Burger King Corp.* v. *Rudzewicz*, supra, 476. But immediately prior to the language the dissent quotes, the court in *Burger King* made clear that "[t]he unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum [s]tate. The application of that rule will vary with the quality and nature of the defendant's activity, but it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum [s]tate, thus invoking the benefits and protections of its laws." (Internal quotation marks omitted.) Id., 474–75.

Applying these legal principles, the court in *Burger King* concluded that, on the basis of the defendant's "voluntary acceptance of the long-term and exacting regulation of his business from Burger King's Miami headquarters," it was "presumptively reasonable for [the defendant] to be called to account [in the forum] for such injuries." Id., 480. This analysis makes clear that minimum contacts did not presumptively exist merely because of the existence of a long-term contractual relationship but because the contract specifically contemplated, and the defendant agreed to, the defendant's continuing interaction with and obligations to the forum and its residents. Read in context, it is clear that a defendant does not create continuing obligations to "the residents of the forum" by merely entering into a long-term contractual relationship with *one* of that forum's residents. The existence of the contractual relationship alone—whether long-term or not—is evidence only of contact with the plaintiff, not with the forum. In that circumstance, the defendant's only connection to the forum is that the plaintiff resides there, which is precisely the kind of random and fortuitous contact that courts caution against relying on to conclude that jurisdiction is proper. The defendant presumably would have entered into the contractual relationship regardless of where the plaintiff was located.

Thus, a court applying *Burger King* must look to all of the surrounding circumstances of a contractual relationship to determine whether a defendant has purposefully availed itself of the benefits of doing business in the forum state such that it should have been foreseeable that it could be sued in that state. The inquiry is a very practical and realistic one. Our review of the pertinent facts persuades us that, in the present case, the answer to that question is no.[15]

## B

In the present case, to establish minimum contacts, the plaintiff relies heavily on the long-term relationship

between the parties. Specifically, the previous licensing agreement with B&M's predecessor lasted for ten years, from 1990 to 2000,[16] and the October, 2000 licensing agreement provided that it would automatically "continue from year to year thereafter until terminated" as a result of one of a number of occurrences listed in § 8 of the agreement. Although the 2000 licensing agreement permitted yearly renewal, unlike the agreement at issue in *Burger King*, it did not anticipate a relationship for a specific amount of time. In *Burger King*, the defendant entered into a "carefully structured [twenty year] relationship that envisioned continuing and [wide reaching] contacts with Burger King in Florida." *Burger King Corp.* v. *Rudzewicz*, supra, 471 U.S. 480. The court determined that the defendant's "voluntary acceptance of the long-term and exacting regulation of his business from Burger King's Miami headquarters" established purposeful availment. Id. In the present case, the defendant did not voluntarily accept a carefully structured, long-term contract but, rather, accepted a contract that allowed it to terminate or cancel the contract on a yearly basis. Also, as we discuss subsequently in this opinion, the contract in the present case is distinguishable from the exacting nature of the contract in *Burger King*, which supported the court's determination of purposeful availment; the contract in the present case did not envision an interactive, highly regulated relationship.

We recognize, however, that the duration of a contractual relationship is a factor in considering minimum contacts. Nevertheless, it is not the length of the relationship, but the quality of the relationship—i.e., the extent the defendant has purposefully reached into the forum—that matters most for determining forum contacts. Other factors have been held to carry greater weight: "[A]ctions in the negotiation and performance of the . . . agreement are more important factors to consider than the duration of the contract in determining whether [there are minimum contacts]. . . . [In prior cases, courts have explained that] the quality rather than the quantity of the contacts is the proper subject of review. Similarly, [the court] should focus . . . on the quality of the parties' relationship, rather than the duration of the relationship." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *Calphalon Corp.* v. *Rowlette*, 228 F.3d 718, 722 (6th Cir. 2000); see *Burger King Corp.* v. *Rudzewicz*, supra, 471 U.S. 479 (after rejecting presumption that contract alone creates minimum contacts, court held that "[i]t is these factors—prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing—that must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum"); *Freudensprung* v. *Offshore Technical Services, Inc.*, 379 F.3d 327, 344–45 (5th Cir. 2004)

(minimum contacts were lacking despite approximately three year contractual relationship, including extensive communication, when contract performance was to occur outside forum); *IDS Publishing Corp.* v. *Reiss Profile Europe, B.V.*, Docket No. 2:16-CV-00535, 2017 WL 4217156, \*7 (S.D. Ohio September 19, 2017) ("despite the [parties'] [l]icense [agreement] being in place for more than ten years, the [c]ourt's focus is on the quality of the parties' relationship rather than its duration"). But see *Mississippi Interstate Express, Inc.* v. *Transpo, Inc.*, 681 F.2d 1003, 1007 (5th Cir. 1982) (acknowledging that court's holding—that contractual relationship that foresees plaintiff unilaterally conducting activity in forum creates minimum contacts—conflicts with those of other federal courts of appeals).

In evaluating the quality of a defendant's contacts, courts have considered the parties' actual course of dealings, the location of performance, the quality and quantity of any communications, the terms of the parties' contract, including any forum selection clause, and whether the defendant reached into the forum, including whether the defendant initiated contact. See, e.g., *Calphalon Corp.* v. *Rowlette*, supra, 228 F.3d 722–23; see also *Halliburton Energy Services, Inc.* v. *Ironshore Specialty Ins. Co.*, 921 F.3d 522, 544 (5th Cir. 2019); *Sangha* v. *Navig8 ShipManagement Private Ltd.*, 882 F.3d 96, 102–103 (5th Cir. 2018); *Universal Leather, LLC* v. *Koro AR, S.A.*, 773 F.3d 553, 560 (4th Cir. 2014), cert. denied, 576 U.S. 1035, 135 S. Ct. 2860, 192 L. Ed. 2d 896 (2015); *Freudensprung* v. *Offshore Technical Services, Inc.*, supra, 379 F.3d 344–45.

For example, courts have found minimum contacts in cases involving long-term contractual relationships when other substantial contacts existed or arose during the course of the relationship. See, e.g., *C.W. Downer & Co.* v. *Bioriginal Food & Science Corp.*, supra, 771 F.3d 67 (four year contractual relationship was not of "short duration," especially in light of extensive collaboration on projects showing continued and wide reaching contacts in forum); *CFA Institute* v. *Institute of Chartered Financial Analysts of India*, 551 F.3d 285, 295 and n.17 (4th Cir. 2009) (thirteen year contractual relationship between plaintiff and nonresident defendant that included significant collaboration supported conclusion that licensing agreement established sufficient minimum contacts, with special weight given to fact that defendant initiated contact); *PKWare, Inc.* v. *Meade*, 79 F. Supp. 2d 1007, 1014–15 (E.D. Wis. 2000) (six year contractual relationship, in addition to quantity and quality of contacts, including numerous communications regarding business dealings and choice of law provision designating Wisconsin law as controlling, supported conclusion that licensing-trademark agreement established sufficient minimum contacts); *Eaton Corp.* v. *Maslym Holding Co.*, 929 F. Supp. 792, 797–98 (D.N.J. 1996) (ten year contractual relationship, regular communications

between parties, several visits by defendant's representatives to plaintiff in forum state, royalty payments defendant made to plaintiff in forum state, and defendant's purchase of "parts" from plaintiff's plant in forum constituted sufficient minimum contacts).

Despite the long-term nature of the agreement at issue, B&M's contacts case are significantly weaker than the defendants' contacts in the foregoing cases and in *Burger King*. In fact, in the life of a contractual relationship of the length involved here, it is difficult to imagine fewer contacts between the defendant and the forum. Besides the long-term nature of the contractual relationship, the plaintiff relies on the following forum contacts: (1) B&M knowingly entered into a contract with the Connecticut based plaintiff; (2) B&M negotiated the contract by sending communications to the plaintiff in Connecticut; (3) the contract contemplated and even mandated that the plaintiff would perform its own obligations under the contract in Connecticut, which would result in Connecticut's being the locus of any harm the plaintiff would suffer as a consequence of a breach of the contract;[17] (4) B&M maintained a nearly twenty year business relationship with the plaintiff in Connecticut, including a visit to the forum and sending hundreds of reports, payments, and other communications to Connecticut; and (5) B&M breached the contract by contacting and injuring the plaintiff in Connecticut.

These contacts, however, do not focus on B&M's purposeful contact with the forum, which is limited to a single visit to the forum after the contract was executed, and occasional, ancillary communications. The other forum contacts relied on by the plaintiff either are not proper considerations under our minimum contacts analysis or do not weigh in favor of jurisdiction. Unlike the plaintiffs in *C.W. Downer & Co.*, *CFA Institute*, *PKWare, Inc.*, and *Eaton Corp.*, the plaintiff here has not established that, during the course of the long-term contractual relationship, B&M had contacts with or continuing obligations to the forum showing that it purposefully availed itself of the protections of the forum. When the plaintiff's own contacts with the forum (e.g., contacts (1), (3) and (5), as previously discussed) are removed from the analysis, as case law demands, what remains, in addition to the length of the contract, is a single visit to the forum after the contract was executed, and occasional, ancillary communications. We conclude that, unlike the plaintiffs in *C.W. Downer & Co.*, *CFA Institute*, *PKWare, Inc.*, and *Eaton Corp.*, the plaintiff in the present case has not established that, during the course of the parties' long-term contractual relationship, B&M had contacts with or continuing obligations to the forum showing that it purposefully availed itself of the benefits and protections of the forum.

For example, the plaintiff, which bears the burden

of establishing jurisdiction, did not allege, let alone offer evidence to establish, that B&M purposefully "reached out" to the forum state by initiating contact with the plaintiff. Although the parties' negotiated over the licensing agreement prior to and after its execution, the record contains nothing to show either that B&M or its predecessor initiated the original licensing agreement or that B&M initiated the October, 2000 licensing agreement.[18] The absence of this evidence weighs against a conclusion that B&M established minimum contacts with the forum. See, e.g., *Diamond Healthcare of Ohio, Inc.* v. *Humility of Mary Health Partners*, 229 F.3d 448, 451 (4th Cir. 2000) (minimum contacts were lacking when plaintiff initiated and negotiated contract between parties in forum state); *Vetrotex CertainTeed Corp.* v. *Consolidated Fiber Glass Products Co.*, 75 F.3d 147, 151–52 (3d Cir. 1996) (minimum contacts were lacking when defendant did not solicit contract or initiate business relationship); *IDS Publishing Corp.* v. *Reiss Profile Europe, B.V.*, supra, 2017 WL 4217156, *7 ("there is no admissible evidence that [the defendant] solicited the [l]icense [agreement] from [the plaintiff]"); see also *RLB & Associates, Ltd.* v. *Aspen Medical Pty.*, Docket No. 2:15-cv-123, 2016 WL 344925, *5 (D. Vt. January 27, 2016) ("[t]he case law is clear that [when] . . . a defendant does not actively initiate contacts in a state, a court does not ordinarily exercise jurisdiction over that defendant, unless there is some other evidence of minimum contacts with the forum state" (internal quotation marks omitted)). A defendant also may reach into a forum through physical presence in that forum. Physical presence may include maintaining offices, employees, real or personal property, or an agent for service of process in the forum state, none of which B&M maintains in the present case. See, e.g., *Universal Leather, LLC* v. *Koro AR, S.A.*, supra, 773 F.3d 557 (one factor in determining minimum contacts is whether defendant maintained offices or property in forum state). Physical presence also may include traveling to the forum to negotiate, execute, or perform the contract. See, e.g., id., 562 (that defendant visited forum at least six times for business meetings with plaintiff supported jurisdiction because defendant "repeatedly reached into the forum state to transact business during [in person] visits there" (internal quotation marks omitted)); *CFA Institute* v. *Institute of Chartered Financial Analysts of India*, supra, 551 F.3d 295 (defendant's visit to forum to approach plaintiff about business venture prior to parties' entering into license agreement supported conclusion that sufficient minimum contacts existed).

In the present case, the plaintiff argues that it established B&M's physical presence in the forum through the affidavit of the plaintiff's president and chief executive officer, Thomas A. Whidden, which the plaintiff submitted in opposition to the defendants' motion to

dismiss. In the affidavit, Whidden averred that "[B&M] representatives have made phone calls, sent faxes and [e-mails], and mailed letters to me hundreds of times at my Connecticut numbers and address concerning our ongoing contractual relationship and related business matters. . . . This included phone calls and a personal visit to me at my Connecticut office by Yves Marchand, [chief executive officer of B&M]." (Citation omitted.) In support of this last assertion, the affidavit includes as an exhibit a fax from Whidden to Stephan Guter at B&M stating that Marchand intended to visit Connecticut in 2003.

Although Whidden's affidavit establishes that Marchand made a single visit to Connecticut, a single visit to the forum is of minimal weight when considered under the totality of the circumstances, especially when, as here, the defendant did not initiate contact, and the contract does not require performance by the defendant in the forum. See, e.g., *Moncrief Oil International, Inc.* v. *OAO Gazprom*, 481 F.3d 309, 312 (5th Cir. 2007) (single visit to forum by defendant's executive was of minimal weight when "the defendant did not perform any of its obligations in Texas, the contract did not require performance in Texas, and the contract [was] centered outside of Texas"); *GMAC Real Estate, LLC* v. *E.L. Cutler & Associates, Inc.*, 472 F. Supp. 2d 960, 962, 965 (N.D. Ill. 2006) (there were insufficient minimum contacts when defendant attended single meeting in forum state and contract did not require performance in forum state); see also *Sneha Media & Entertainment, LLC* v. *Associated Broadcasting Co. P Ltd.*, 911 F.3d 192, 199 (4th Cir. 2018) (single business meeting in forum was insufficient to establish minimum contacts); *CEM Corp.* v. *Personal Chemistry, AB*, 55 Fed. Appx. 621, 625 (4th Cir. 2003) ("[o]ne visit to the state . . . would not put [the defendant] on notice that it 'should reasonably anticipate being haled into court' in North Carolina"); *R.L. Lipton Distributing Co.* v. *Dribeck Importers, Inc.*, 811 F.2d 967, 970 (6th Cir. 1987) ("one or two visits during five years by [the defendant's] personnel" were "sporadic and insubstantial contacts" that "by themselves [could not] support a finding of personal jurisdiction").[19]

Rather, the exhibits the parties submitted demonstrate that, with the exception of this single visit, meetings between the parties regarding the licensing agreement occurred outside of Connecticut. For example, Whidden traveled to Europe to represent the plaintiff during negotiations. The plaintiff's exhibits also demonstrate that, from 1997 to 2000, the board of directors of NSW, B&M's predecessor, held meetings at Cape Hatteras, North Carolina, in New York City and in Orlando, Florida, but not in Connecticut. Representatives of the plaintiff attended the meetings, and the previous licensing agreement appears to have been at issue at the meetings. The plaintiff's exhibits also reflect

a planned meeting before the new 2000 licensing agreement between the plaintiff and one of the board members of NSW, and Mistral Sports Group GmbH, in Dusseldörf, Germany.[20] The plaintiff also refers to a meeting Whidden attended in Europe. Accordingly, like the trial court, we conclude that the plaintiff, which has the burden of establishing minimum contacts, has failed to establish that B&M reached into Connecticut through its physical presence in the forum.

To the extent the plaintiff relies on its conduct in the forum to establish physical presence in the forum, as discussed previously, it is well established that it is the forum contacts of the defendant, not the plaintiff, that are relevant in determining minimum contacts. See, e.g., *Walden* v. *Fiore*, supra, 571 U.S. 284 ("[T]he relationship must arise out of contacts that the 'defendant himself' creates with the forum [s]tate. . . . We have consistently rejected attempts to satisfy the defendant-focused 'minimum contacts' inquiry by demonstrating contacts between the plaintiff (or third parties) and the forum [s]tate." (Citations omitted; emphasis omitted.)); *Tuazon* v. *R.J. Reynolds Tobacco Co.*, 433 F.3d 1163, 1169 (9th Cir.) ("[t]he cornerstone of the due process inquiry is an analysis of the defendant's contacts with the selected forum"), cert. denied, 549 U.S. 1076, 127 S. Ct. 723, 166 L. Ed. 2d 560 (2006); see also *Burger King Corp.* v. *Rudzewicz*, supra, 471 U.S. 474 ("[t]he unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum [s]tate" (internal quotation marks omitted)). The United States Supreme Court explicitly has rejected reliance on a defendant's knowledge that a plaintiff has "strong forum connections" because this type of "analysis impermissibly allows a plaintiff's contacts with the defendant and forum to drive the jurisdictional analysis." (Internal quotation marks omitted.) *Walden* v. *Fiore*, supra, 289.

Nevertheless, the plaintiff argues that B&M purposefully reached into the forum because it knew that the plaintiff performed its obligations under the contract in Connecticut and suffered harm caused by the breach of contract in Connecticut.[21] The fact that B&M was aware, as the dissent states, that "[the plaintiff] would perform its obligations from and suffer any consequences in Connecticut" is not relevant to our minimum contacts analysis. See *Walden* v. *Fiore*, supra, 571 U.S. 289. None of the plaintiff's forum contacts—its performance in the forum, its use of the royalty funds in the forum, its sales and marketing in the forum, any harm it suffers in the forum—is relevant to determining whether the defendant has minimum contacts with the forum. The plaintiff's reliance on these facts seems to stem from a belief that it is reasonable that a corporation should expect that, if it voluntarily enters into a long-term contractual relationship with another corporation, it will likely be subject to jurisdiction (for inci-

dents involving the contractual relationship) in that other corporation's home state. Although such a concern may factor into determining the reasonableness of the exercise of jurisdiction over the defendant in the forum, it is not a proper concern for the minimum contacts analysis. See id.

Even among cases involving long-term contractual relationships, we have found none—and the plaintiff has not pointed us to any—in which courts have found minimum contacts when there was insufficient evidence that the defendant initiated contact, there was insufficient evidence of physical presence in the forum, and the contract did not contemplate performance by the defendant in the forum. See, e.g., *Freudensprung* v. *Offshore Technical Services, Inc.*, supra, 379 F.3d 344–45 (minimum contacts were lacking despite approximately three year contractual relationship, including extensive communication, when contract performance was to occur outside forum); *IDS Publishing Corp.* v. *Reiss Profile Europe, B.V.*, supra, 2017 WL 4217156, *7 (minimum contacts were lacking despite more than ten year contractual relationship during which plaintiff initiated contact, defendant never was physically present in forum, and licensing agreement contemplated exploitation of markets outside forum).

In the present case, the October, 2000 licensing agreement granted B&M a worldwide license to certain trademarks and required B&M to use its best good faith efforts to produce, market, and sell the licensed products. The agreement did not explicitly contemplate performance in Connecticut. Rather, the terms of the licensing agreement create a connection to Wisconsin but are void of any reference to Connecticut. For example, the agreement included a choice of law provision designating Wisconsin law as controlling the agreement and required B&M to send its royalty fees to a Wisconsin bank. The agreement also provided that "[a]ll notices for the purposes of [the] agreement" had to be sent to the secretary and general counsel for the plaintiff in Sheboygan, Wisconsin.

Although a choice of law clause is not dispositive, those three contractual provisions raise serious questions regarding the foreseeability that B&M could be haled into court in Connecticut. See *CutCo Industries, Inc.* v. *Naughton*, 806 F.2d 361, 366–67 (2d Cir. 1986) ("a choice of law provision in a contract does not constitute a voluntary submission to personal jurisdiction" but deserves "some weight" when determining whether personal jurisdiction exists); see also *K-V Pharmaceutical Co.* v. *J. Uriach & CIA, S.A.*, 648 F.3d 588, 593–94 (8th Cir. 2011) (considering directions in parties' contract for payments to be sent to plaintiff in determining whether minimum contacts existed); cf. *Vetrotex CertainTeed Corp.* v. *Consolidated Fiber Glass Products Co.*, supra, 75 F.3d 152 (jurisdiction was lacking when

defendant did not initiate contact and sent payments to plaintiff in different forum). Under similar circumstances, when the choice of law provision designated another forum and the defendant had an insufficient physical presence within the forum, courts have found insufficient minimum contacts. See, e.g., *Halliburton Energy Services, Inc.* v. *Ironshore Specialty Ins. Co.*, supra, 921 F.3d 543–44 (minimum contacts with forum were lacking when defendant insurer had "virtually no connections" to forum and insurance policy at issue was governed by New York law); *Tidy Car International, Inc.* v. *Firestine*, 810 F. Supp. 199, 205 (E.D. Mich. 1993) (there were insufficient contacts with Michigan when defendant never visited forum and choice of law provision designated New York law as controlling). Additionally, the parties' course of dealings shows that B&M, despite having a worldwide license, never conducted any business in Connecticut. See *Halliburton Energy Services, Inc.* v. *Ironshore Specialty Ins. Co.*, supra, 544 (terms of contract and parties' actual course of dealing must be considered in determining whether minimum contacts exist).

The fact that not only did B&M not perform its contractual obligations in Connecticut, but also that the contract did not require it to do so, weighs heavily against finding minimum contacts. Courts have held that defendants have not reached out and thus purposefully availed themselves of the forum if the contract does not contemplate, and the parties' course of dealings does not show, performance in the forum state. See, e.g., id. (jurisdiction was lacking when defendant did not negotiate contract in Texas, performance did not occur in Texas, and contract's choice of law provision designated New York law as controlling); *Sangha* v. *Navig8 ShipManagement Private Ltd.*, supra, 882 F.3d 103 ("a defendant does not have minimum contacts with a state when it does not have a physical presence in the state, it did not conduct business in the state, and the contract underlying the business transaction was not signed in the state and did not call for performance in the state"); *International Energy Ventures Management, L.L.C.* v. *United Energy Group, Ltd.*, 818 F.3d 193, 213 (5th Cir. 2016) (minimum contacts were lacking when "(1) [the defendant] did not negotiate the agreement in Texas, (2) [it] did not travel to Texas because of that agreement, and (3) the unwritten agreement did not require performance in Texas"); *Diamond Healthcare of Ohio, Inc.* v. *Humility of Mary Health Partners*, supra, 229 F.3d 451 (contacts were insufficient to support jurisdiction, and "[n]ot only did [the plaintiff] initiate the contractual relationship in Ohio, but the resulting agreement contemplated the bulk of the contract's performance . . . in . . . Ohio"); *Iowa Electric Light & Power Co.* v. *Atlas Corp.*, 603 F.2d 1301, 1303–1304 (8th Cir. 1979) ("entering into a contract with a forum resident does not provide the requisite contacts

between a defendant and the forum state . . . [especially] when all elements of the defendant's performance are to take place outside of the forum" (citation omitted)), cert. denied, 445 U.S. 911, 100 S. Ct. 1090, 63 L. Ed. 2d 327 (1980). A lack of performance in the forum undermines jurisdiction because, if the defendant never attempted to "exploit any market for its products in the [forum] state . . . but rather had contact with the state only because the plaintiff chose to reside there," the defendant has not purposefully availed itself of the benefits and protections of the forum's laws. (Internal quotation marks omitted.) *Calphalon Corp.* v. *Rowlette*, supra, 228 F.3d 722–23.

Thus, despite the length of the contractual relationship, the lack of evidence regarding whether B&M initiated contact and B&M's physical presence in the forum or performance of the contract in the forum, coupled with the terms of the contract, belies any contention that B&M purposefully availed itself of the benefits and protections of Connecticut's laws. Specifically, the plaintiff has failed to demonstrate—and this court cannot perceive—how B&M has received those benefits and protections when it has operated its business and performed its obligations under the licensing agreement completely outside the forum. The defendant never attempted to " 'exploit any market for its products' " in Connecticut. Id., 722.

It is true that, after signing the October, 2000 licensing agreement the defendant sent the agreement to Connecticut, where it was executed by the plaintiff. For purposes of jurisdiction, however, the fact that B&M mailed the contract to the plaintiff in Connecticut is of little consequence in determining whether minimum contacts exist. Such limited contact is ancillary to the execution of the contract. See, e.g., *Freudensprung* v. *Offshore Technical Services, Inc.*, supra, 379 F.3d 344 ("the combination of . . . engaging in communications related to the execution and performance of the contract, and the existence of a contract between the nonresident defendant and a resident of the forum are insufficient to establish the minimum contacts"); see also *Jones* v. *Artists Rights Enforcement Corp.*, 789 Fed. Appx. 423, 426 (5th Cir. 2019) ("[a]n exchange of communications in the course of developing and carrying out a contract . . . does not, by itself, constitute the required purposeful availment of the benefits and protections of [a forum state's] law" (internal quotation marks omitted)); *Stuart* v. *Spademan*, supra, 772 F.2d 1193 ("an exchange of communications between a resident and a nonresident in developing a contract is insufficient of itself to be characterized as purposeful activity invoking the benefits and protection of the forum state's laws").

Nevertheless, the plaintiff points to other communications between itself and B&M that it claims, when

considered alongside the long-term nature of the contractual relationship, establish minimum contacts. The plaintiff argues that the continuing and regular communications between them demonstrate that B&M purposefully availed itself of the benefits of its in-state activities. It is true that the parties communicated regularly and consistently regarding the contract, including communications regarding B&M's payment of royalties. Most of the evidence submitted shows that the parties communicated via e-mail and fax on a quarterly basis when B&M provided the plaintiff with its quarterly royalty report, as required by the agreement. The parties also communicated via e-mail regarding the alleged breach of contract at issue. The plaintiff also submitted some evidence that the parties communicated via telephone on other occasions. Despite this evidence, we conclude that the parties' communications do not weigh in favor of jurisdiction because they were ancillary to the performance of the contract rather than demonstrative of continuous collaboration between the parties. Additionally, even if the parties' communications weighed in favor of jurisdiction, the lack of evidence that B&M reached out to the forum or performed any of its contractual obligations in the forum militates against jurisdiction.

In the minimum contacts analysis, some courts find consistent and continuing communications between the parties to favor a finding of jurisdiction, regardless of the substance of the communications. See, e.g., *Creative Calling Solutions, Inc.* v. *LF Beauty Ltd.*, 799 F.3d 975, 980 (8th Cir. 2015) (after defendant initiated contact with plaintiff, parties e-mailed and phoned each other for close to two years); *Johnson Worldwide Associates, Inc.* v. *Brunton Co.*, 12 F. Supp. 2d 901, 907 (E.D. Wis. 1998) ("routine correspondence regarding the licensing agreement" over long-term contractual relationship, as well as visits to forum, supported jurisdiction). Nevertheless, these cases do not hold that consistent and continuing communication by itself is sufficient to justify jurisdiction but, rather, consider it as one factor in the totality of the circumstances analysis. See, e.g., *Far West Capital, Inc.* v. *Towne*, 46 F.3d 1071, 1077 (10th Cir. 1995) ("[i]t is [well established] that phone calls and letters are not necessarily sufficient in themselves to establish minimum contacts"). Thus, even if we adopted this approach, these cases are distinguishable because they involved continuous communication coupled with other significant contacts, such as reaching out to the forum.[22] In the present case, evidence of other contacts is lacking, such as initiating contact or a sufficient physical presence in the forum, which weighs against a finding of minimum contacts despite the communications between the parties.

Other courts have determined that use of the mail and telephone communications are "ancillary" to the contract's execution and performance and do not con-

stitute a purposeful availment of the benefits and protections of the forum. See, e.g., *Reynolds* v. *International Amateur Athletic Federation*, 23 F.3d 1110, 1119 (6th Cir.) ("[t]he use of interstate facilities such as the telephone and mail is a secondary or ancillary factor and cannot alone provide the minimum contacts required by due process" (internal quotation marks omitted)), cert. denied, 513 U.S. 962, 115 S. Ct. 423, 130 L. Ed. 2d 338 (1994); *Scullin Steel Co.* v. *National Railway Utilization Corp.*, 676 F.2d 309, 314 (8th Cir. 1982) (same); see also *Michigan Coalition of Radioactive Material Users, Inc.* v. *Griepentrog*, 954 F.2d 1174, 1177 (6th Cir. 1992) ("[t]elephone conversations and letters are insufficient to fulfill" purposeful availment requirement); *Roth* v. *Garcia Marquez*, 942 F.2d 617, 622 (9th Cir. 1991) ("ordinarily use of the mails, telephone, or other international communications simply [does] not qualify as purposeful activity invoking the benefits and protection of the [forum] state" (internal quotation marks omitted)). Under this approach, the parties' communications in implementing the contract carry minimal weight and do not, as the dissent suggests, "go a long way" in establishing minimum contacts.

In this endeavor, courts often will evaluate the weight of communications between the parties, considering not only the extent of the communications but also their quality and substance. See, e.g., *Universal Leather, LLC* v. *Koro AR, S.A.*, supra, 773 F.3d 560 (considering "the nature, quality and extent of the parties' communications about the business being transacted" and requiring substantial collaboration (internal quotation marks omitted)); *CFA Institute* v. *Institute of Chartered Financial Analysts of India*, supra, 551 F.3d 295 (precontractual negotiations initiated by defendant, correspondence and collaboration between parties during thirteen year contractual relationship and visits by defendant to forum state evidenced nature of business relationship); *Calphalon Corp.* v. *Rowlette*, supra, 228 F.3d 723 ("phone, mail, and fax contact with [the plaintiff] in Ohio . . . occurred solely because [the plaintiff] chose to be headquartered in Ohio, not because [the defendants] sought to further [their] business and create 'continuous and substantial' consequences there"). For example, "informational communications in furtherance of [a contract between a resident and a nonresident do] not establish the purposeful activity necessary for a valid assertion of personal jurisdiction over [the nonresident defendant]." (Internal quotation marks omitted.) *Vetrotex CertainTeed Corp.* v. *Consolidated Fiber Glass Products Co.*, supra, 75 F.3d 152; accord *Sunbelt Corp.* v. *Noble, Denton & Associates, Inc.*, 5 F.3d 28, 32 (3d Cir. 1993). The substance of the communications weighs in favor of jurisdiction when it evinces collaboration regarding the business and is not merely incidental or ancillary to performance of the contract. See *Rice* v. *Karsch*, 154 Fed. Appx. 454, 463–64 (6th Cir.

2005) (finding that communications were " 'ancillary' " when phone, mail, and e-mail contacts in forum occurred only because plaintiff was located there, not because defendant sought to further personal business or to create continuous and substantial consequences there); see also *John Crane, Inc.* v. *Shein Law Center, Ltd.*, 891 F.3d 692, 696 (7th Cir. 2018) (weighing communications on basis of whether "[t]he communications were not incidental to other conduct").

*Burger King* itself suggests that communications between parties weigh in favor of jurisdiction when they involve collaboration between the parties, and the focus is on the quality and not the quantity of the communications. Specifically, the court in *Burger King* noted that the parties "carried on a continuous course of direct communications by mail and by telephone" regarding disputes over building design, site development fees, rent computation, and the defaulted payments because the plaintiff in Florida was granted all decision-making authority under the parties' contract. *Burger King Corp.* v. *Rudzewicz*, supra, 471 U.S. 481. The defendant was required to communicate with the plaintiff in Florida to obtain permission for almost all business decisions, with this level of oversight being central to the underlying contract. Id. Those communications reflected extensive collaboration regarding the business, thereby supporting a determination that the defendant had reached out to the forum.

We recognize that, recently, the United States Supreme Court in *Walden* v. *Fiore*, supra, 571 U.S. 277, explained that, "although physical presence in the forum is not a prerequisite to jurisdiction . . . physical entry into the [s]tate—either by the defendant in person or through an agent, goods, mail, or some other means— is certainly a relevant contact." (Citation omitted.) Id., 285. The court's consideration of direct communications between the parties is consistent with the recognition by the court in *Burger King* of technological changes in modes of communication: "[I]t is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a [s]tate in which business is conducted." *Burger King Corp.* v. *Rudzewicz*, supra, 471 U.S. 476. That observation has become only more true in the thirty-six years since the *Burger King* decision, as the globe shrinking evolution of digital communications has made it ever easier for an entity to conduct business without once setting foot in the forum state.

Nevertheless, although it recognized that direct communication between the parties is a relevant factor, the court in *Walden* clarified that the " 'minimum contacts' analysis [must look] to the defendant's contacts with the forum [s]tate itself, not the defendant's contacts

with persons who reside there. . . . To be sure, a defendant's contacts with the forum [s]tate may be intertwined with his transactions or interactions with the plaintiff or other parties. But a defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction. . . . Due process requires that a defendant be haled into court in a forum [s]tate based on his own affiliation with the [s]tate, not based on the 'random, fortuitous, or attenuated' contacts he makes by interacting with other persons affiliated with the [s]tate." (Citations omitted.) *Walden* v. *Fiore*, supra, 571 U.S. 285–86. Thus, the court in *Walden* recognized that it is the substance of the communication that is central to the analysis—whether the defendant was purposefully reaching out to the forum rather than communicating within the forum merely because the plaintiff happens to reside there. See *Calphalon Corp.* v. *Rowlette*, supra, 228 F.3d 723 (holding that contacts with forum are "random, fortuitous, and attenuated" if they occur merely because plaintiff is located in forum (internal quotation marks omitted)).

In the present case, although it is true that the parties' communications involved their contractual relationship, unlike in *Burger King*, there is limited evidence of any continuous or extensive collaboration regarding the parties' businesses or the licensing agreement. Not only is the level of oversight and control significantly less than it was in *Burger King*, but continuous communication was not necessary for B&M to run its business. B&M did not have to receive permission from the plaintiff in Connecticut for its business decisions before acting. Thus, the nature of the communications in the present case is substantively different from the communications in *Burger King*, which were essential to the performance of the contract in that case. The quality and substance of the communications in this case do not show that B&M purposely availed itself of the forum. Rather, as we discuss subsequently in this opinion, the evidence shows that these communications were ancillary or incidental to the contractual relationship, and occurred in Connecticut merely because the plaintiff happened to be located in the forum.

Most telling, the parties submitted exhibits appended to their affidavits that show the nature of these communications. Some communications involved the negotiation and signing of the licensing agreement, which, as already discussed, are considered ancillary to the contract and do not support jurisdiction. The purpose of many of the other communications was to forward the royalty reports. Contrary to the dissent's contention, these royalty reports were not "central and essential" to B&M's performance of the contract. These reports, which essentially are receipts, were what case law describes as "ancillary" to the contract, with B&M's sending the reports to the plaintiff in Connecticut not to avail itself of the forum but merely because of the

plaintiff's location in the forum. See, e.g., *Diamond Healthcare of Ohio, Inc.* v. *Humility of Mary Health Partners*, supra, 229 F.3d 452 (contract requirement that defendant send plaintiff certain information was ancillary and did not justify jurisdiction). Because the contract made no reference to Connecticut in requiring B&M to forward these reports to the plaintiff, B&M would have been required to send the reports regardless of where the plaintiff was located, thereby rendering this contact between the parties "fortuitous" under the case law. See, e.g., *Calphalon Corp.* v. *Rowlette*, supra, 228 F.3d 723 (holding that contacts in forum are "random, fortuitous, and attenuated" if they occur merely because plaintiff is located in forum (internal quotation marks omitted)); *Johnson* v. *UBS AG*, Docket No. 2:20-cv-00357-MCS-JC, 2020 WL 6826477, *4 (C.D. Cal. November 12, 2020) (" '[w]hen a defendant's relationship to the forum state arises from the fortuity of where the plaintiff resides . . . it does not provide the basis for specific jurisdiction there' "), aff'd, 860 Fed. Appx. 531 (9th Cir. 2021). That does not mean that these reports were not important to the plaintiff. Under governing case law, a contact is ancillary or fortuitous if it is not the result of a defendant's deliberate engagement in significant activities within the forum or its having continuing obligations with the forum. See *Burger King Corp.* v. *Rudzewicz*, supra, 471 U.S. 475–76; *Diamond Healthcare of Ohio, Inc.* v. *Humility of Mary Health Partners*, supra, 229 F.3d 452; *Calphalon Corp.* v. *Rowlette*, supra, 228 F.3d 722–23. Here, the contract did not envision that B&M would deliberately engage in activity in Connecticut or have continuous obligations within Connecticut. Any link to Connecticut was merely because of the plaintiff's location in the forum, which was a matter of happenstance that could have changed at any time. By contrast, for example, the contract envisioned B&M's making payments of royalties to the plaintiff in Wisconsin, which was not fortuitous or happenstance.[23]

The parties also exchanged correspondence regarding the dispute that led to the current litigation. Communications in advance of litigation or during litigation are considered incidental and are afforded little weight in determining whether minimum contacts exist because they encourage dispute resolution. See, e.g., *Pro Axess, Inc.* v. *Orlux Distribution, Inc.*, 428 F.3d 1270, 1278 n.5 (10th Cir. 2005) (in determining whether purposeful availment has occurred, recriminations between parties in advance of litigation are afforded less weight so as to encourage informal resolution of disputes); *Sheldon* v. *Khanal*, Docket No. 07-2112-KHV, 2007 WL 4233628, *5 (D. Kan. November 29, 2007) ("[The] [d]efendants' communications into Kansas were incidental to the resolution of the bankruptcy proceeding, the completion of the judicial sale and the satisfaction of the mortgage [all of which related to the property at issue]. The quality

of these contacts [cuts] against the [c]ourt's exercise [of] personal jurisdiction over [certain of the defendants]. . . . None of the matters, communications or transactions between [the] plaintiffs and [those defendants] created a substantial connection to the [s]tate of Kansas [that] would permit the [c]ourt to exercise personal jurisdiction over [those defendants]." (Citation omitted.)).

Thus, nothing about the proffered communications shows that B&M was purposefully reaching into the forum. Rather, these communications show that B&M communicated within Connecticut only because the plaintiff was located there. These communications do not show substantial collaboration regarding the business, as in *Burger King*, in which the communications were necessary under the contract for approval of almost all business decisions. *Burger King Corp.* v. *Rudzewicz*, supra, 471 U.S. 481. Here, the communications were ancillary and incidental to the performance of the contract. Accordingly, B&M's communications with the plaintiff do not show that it purposefully availed itself of the benefits and protections of the forum.

Finally, the plaintiff contends that the parties entered into a carefully structured contractual relationship, although the plaintiff does not rely on any particular provision of the contract in support of this argument.[24] Unlike in *Burger King*, however, the contract at issue does not envision continuing and wide reaching contacts into the forum by the defendant. It is true that various provisions in the licensing agreement give the plaintiff oversight over some aspects of B&M's production of the licensed products, which are owned, produced, marketed, and sold by B&M but contain the plaintiff's trademarks and trade name. The agreement provides the plaintiff "the right, at reasonable times, to inspect the [l]icensed [p]roducts, the premises of B&M on which such products are manufactured or stored, and all quality control test data of B&M pertaining thereto in order to determine and [ensure] that all [l]icensed [p]roducts conform to the quality standards established herein." The agreement also gives the plaintiff the right to receive, when it deems it necessary, samples of the licensed products, as well as examples of advertising and promotional materials and quality control test data to determine whether the licensed products conform to quality standards contained in the licensing agreement. The agreement further provides that, if the plaintiff notifies B&M that the licensed products do not comply with those quality standards, B&M is obligated to correct any defects. The plaintiff also may request an audit of B&M's books and records as they relate to the licensed products. At the end of each fiscal year, B&M is obligated to provide the plaintiff with a set of financial statements demonstrating B&M's financial status. The parties' course of dealings shows

that B&M e-mailed the plaintiff quarterly financial statements and royalty reports.

These provisions do not create a "carefully structured [long-term] relationship that envisioned continuing and [wide reaching] contacts" in Connecticut with "exacting regulation" of the defendant's business, as in *Burger King Corp.* v. *Rudzewicz*, supra, 471 U.S. 465, 480. From its offices in Florida, Burger King imposed many requirements on franchisees and, thus, controlled the defendant's daily operations. Among other things, Burger King regulated the defendant's accounting and insurance practices, hours of operation, building layout, service and cleanliness standards, as well as the range, quality, appearance, size, taste, and processing of menu items. Id., 465 n.4. It was not Burger King's relationship with and authority over the defendant, however, that weighed in favor of jurisdiction; see id., 475–76 (focus is on defendant's contacts with forum, not plaintiff's contacts with forum); but the fact that its control over his business required him to consistently and continuously reach out to Florida to obtain authorization for the operation of his business, thereby establishing purposeful availment and providing him with notice that he could be sued in Florida.

By contrast, the October, 2000 licensing agreement does not grant the plaintiff significant decision-making authority over aspects of B&M's business. See id., 485 n.28 ("[s]ome franchises may . . . involve different [decision-making] structures, such that a franchisee should not reasonably anticipate out-of-state litigation"). The contract requires only that B&M use its best, good faith efforts in marketing and selling the licensed products, which, with the exception of the inclusion of the plaintiff's trademarks and trade name, are owned by B&M. It does not require B&M to conduct its business in any particular fashion or require it to comply with any decisions the plaintiff makes regarding its business operations beyond those relating to the use of the trademarks and trade name. Although the agreement permits the plaintiff to inspect B&M's premises and the licensed products, as well as to audit B&M, these oversight measures do not highly regulate B&M's business—and certainly not in the same way Burger King possessed almost complete control and authority over the defendant's restaurant in *Burger King*. Rather, the agreement's oversight provisions regulate only B&M's use of the plaintiff's trademarks and trade name. Although the licensing agreement requires B&M to obtain approval from the plaintiff as to the design of certain licensed products, the plaintiff is not authorized to regulate the daily operations of B&M's business. Unlike in *Burger King*, in which the defendant consistently and continuously had to reach out to Florida to obtain authorization for the operation of his business, B&M was not required to reach out to Connecticut to run its business. Rather, the limited supervisory contractual provisions, such as

the right to inspect and the right to receive royalty reports, are ancillary and incidental to the licensing agreement. As discussed previously, it was the actual payment of the royalties and the use of the trademark that were the critical components of the agreement. Courts have found oversight provisions similar to those in the present case to be ancillary and not to support jurisdiction. See, e.g., *Diamond Healthcare of Ohio, Inc.* v. *Humility of Mary Health Partners*, supra, 229 F.3d 452 (contract requirement that defendant send plaintiff certain information was ancillary and did not justify jurisdiction); *Guinness Import Co.* v. *Mark VII Distributors, Inc.*, 153 F.3d 607, 614 (8th Cir. 1998) ("[T]here was no evidence that [the foreign entity] exercised control over the distribution of its products in the United States or controlled the importer's decisions as to distribution. All distributorship decisions were made by the distributor and the importer . . . ."); *RLB & Associates, Ltd.* v. *Aspen Medical Pty.*, supra, 2016 WL 344925, *6 (minimum contacts were lacking when contract "did not regulate where [the] [p]laintiff worked, the hours it worked, the manner in which it approached potential clients, or the amount of time it devoted to providing its services").

Moreover, the parties' course of dealing calls into question the extent to which the plaintiff exercised its limited oversight rights under the licensing agreement. For example, one of the plaintiff's own exhibits reveals that the first time it attempted to exercise its auditing rights under the licensing agreement was sometime in 2017. Cf. *Burger King Corp.* v. *Rudzewicz*, supra, 471 U.S. 480. We find no evidence in the record rebutting this statement. That is not to say that we require regular exercise of contractual rights to inspect. Rather, it is well established that, in addition to the terms of the contract itself, the parties' actual course of dealing is relevant to the determination of whether minimum contacts exist. See id., 478 (considering "the terms of the contract and the parties' actual course of dealing"). We acknowledge, however, that, even if a contract term is not carried out, the terms of the contract may show that the parties contemplated the defendant's contact with or continuing obligation to the forum, which would weigh in favor of jurisdiction. See *K-V Pharmaceutical Co.* v. *J. Uriach & CIA, S.A.*, supra, 648 F.3d 594. We merely conclude that none of the contract provisions at issue weighs in favor of jurisdiction in this case.

In summary, considering the totality of the circumstances, we conclude that the plaintiff has failed to establish that B&M has sufficient minimum contacts with Connecticut to justify the exercise of personal jurisdiction. Because the plaintiff failed to satisfy its burden regarding minimum contacts, we do not need to determine whether personal jurisdiction would be reasonable. See *Vetrotex CertainTeed Corp.* v. *Consolidated Fiber Glass Products Co.*, supra, 75 F.3d 154 n.9.

Therefore, we affirm the trial court's judgment of dismissal for lack of personal jurisdiction.

## II

The dissent disagrees with our holding, arguing that we improperly apply the relevant standard. The plaintiff, however, had the burden of establishing minimum contacts, and its allegations and proof were modest at best. Even when we apply the favorable motion to dismiss standard, as we must, the plaintiff has failed to satisfy its burden of proof. To overcome this failure, the dissent seeks to supplement the plaintiff's arguments with those of its own—specifically, the dissent relies on (1) sales made by the plaintiff and B&M's sister entity within the forum, (2) speculation regarding who initiated the October, 2000 agreement, (3) the potential availability to B&M of remedies under the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq., and (4) provisions in the contract regarding litigation support. Although the dissent is correct that we must conduct a de novo review of the record to determine whether the plaintiff satisfied its burden, there is a difference between conducting a de novo review of the record to address the legal arguments raised by the parties and addressing new, legal arguments that have not been raised, for which the record is insufficient. Under the latter circumstance, the applicable legal standards do not require this court to consider every possible legal argument the plaintiff could have made and infer from any void in the record jurisdictional facts needed to resolve these unraised legal arguments in favor of the plaintiff. Rather, the plaintiff's failure to raise such legal arguments goes to whether it satisfied its burden of proof. We briefly address the dissent's arguments to the extent we have not done so already.

### A

The dissent's claim that, "at this stage in the proceedings, the plaintiff need only make a prima facie showing that jurisdiction is proper," contradicts our well established legal standard. In *Designs for Health, Inc.* v. *Miller*, 187 Conn. App. 1, 201 A.3d 1125 (2019), the only case from this state that the dissent cites for this "prima facie" standard, the dispositive (and only) jurisdictional fact at issue—whether the defendant had signed the contract containing a forum selection cause—was disputed, with both parties offering competing evidence on the issue. This is not true of the present case. The Appellate Court in *Designs for Health, Inc.*, explained that a plaintiff's burden is lowered to require only a prima facie showing to survive a motion to dismiss *if jurisdictional facts are disputed* and an evidentiary hearing is not held. The plaintiff would then be required at trial to satisfy its burden of establishing jurisdiction by a preponderance of the evidence. *Designs for Health, Inc.* v. *Miller*, supra, 14.

The dissent contends that the prima facie standard applies whenever a "defendant challenges the trial court's personal jurisdiction but no evidentiary hearing is requested or held." It was in fact true in *Designs for Health, Inc.*, that neither party requested a hearing and that the trial court did not hold one, but that was hardly the point. The point was that the jurisdictional fact (whether the defendant signed the contract) was *disputed*, and no hearing was held. In that circumstance, the trial court could neither resolve the disputed fact itself nor hold the plaintiff to the burden of proof that would apply at trial (i.e., a preponderance of the evidence).

In the present case, there are no disputed facts relevant to our minimum contacts analysis, and the plaintiff does not mention a "prima facie" standard or how it helps its argument.[25] Contrary to the dissent's argument, under our well established standard, a fact is not disputed simply because the defendant's evidence conflicts with the plaintiff's allegations. If that were the rule, then a defendant could never have a case dismissed for lack of personal jurisdiction unless the plaintiff's factual allegations were insufficient. Our rules and case law permit a defendant to contest jurisdictional allegations, thereby requiring a plaintiff to offer proof to support them.

The cases from other jurisdictions the dissent cites, including from the United States Court of Appeals for the Second Circuit, support our analysis. These cases, like *Designs for Health, Inc.*, involved disputed issues of jurisdictional facts whereby both parties offered competing evidence and no evidentiary hearing was held, thus implicating the prima facie standard. See *K-V Pharmaceutical Co.* v. *J. Uriach & CIA, S.A.*, supra, 648 F.3d 592 (citing to cases such as *Dever* v. *Hentzen Coatings, Inc.*, 380 F.3d 1070, 1072–73 (8th Cir. 2004), cert. denied, 543 U.S. 1147, 125 S. Ct. 1304, 161 L. Ed. 2d 108 (2005), that make clear that plaintiff has prima facie burden to allege sufficient facts to support jurisdiction, that defendant may test this prima facie showing through affidavits and exhibits, after which, if defendant has raised meritorious challenge to jurisdiction, burden shifts back to plaintiff to provide counterevidence, otherwise plaintiff fails to meet its burden); *Intercon, Inc.* v. *Bell Atlantic Internet Solutions, Inc.*, 205 F.3d 1244, 1247 (10th Cir. 2000) ("[When] . . . there has been no evidentiary hearing, and the motion to dismiss for lack of jurisdiction is decided on the basis of affidavits and other written material, the plaintiff need only make a prima facie showing that jurisdiction exists. . . . If the parties *present conflicting affidavits*, all factual disputes must be resolved in the plaintiff's favor, and the plaintiff's prima facie showing is sufficient notwithstanding the contrary presentation by the moving party." (Emphasis added; internal quota-

tion marks omitted.)); see also *Ins. Corp. of Ireland, Ltd.* v. *Compagnie des Bauxites de Guinee*, 456 U.S. 694, 716, 102 S. Ct. 2099, 72 L. Ed. 2d 492 (1982) (Powell, J., concurring in the judgment) (plaintiff offered evidence in support of allegations to meet prima facie standard); *Guidry* v. *United States Tobacco Co.*, 188 F.3d 619, 625 (5th Cir. 1999) ("[w]hen a court rules on a motion to dismiss for lack of personal jurisdiction without holding an evidentiary hearing . . . the nonmoving party need only make a prima facie showing, and the court must accept as true the nonmov[ant's] allegations and resolve all factual disputes in its favor" when both parties offer evidence regarding disputed jurisdictional facts). But see *Grand Entertainment Group, Ltd.* v. *Star Media Sales, Inc.*, 988 F.2d 476, 483 (3d Cir. 1993) (case was not clear as to whether both parties presented evidence).

B

The dissent also takes issue with our holding that the plaintiff has failed to allege that B&M had a physical presence in the forum. The dissent contends that B&M has conducted business in Connecticut through its sister entity, B&M USA, arguing that B&M reached into the forum because B&M USA marketed and sold the licensed products in Connecticut. In this court, the plaintiff does not make this argument.[26] Because the dissent does not consider it abandoned, we briefly address the issue, which, at any rate, fails factually and legally.

The allegations and evidence show that B&M USA sold the licensed products in the forum and that the plaintiff advertised and offered for sale the licensed products in the forum. Nothing in the record shows that B&M itself made any sales in Connecticut, however. Although a foreign corporation's decision to sell products in the forum may support jurisdiction, B&M did not make any sales in the forum, unless the sales by B&M USA or the plaintiff can be imputed to it.

The dissent contends that these sales can indeed be imputed to B&M because both B&M USA and the plaintiff are part of B&M's distribution channel. The case law the dissent cites, however, does not support this assertion. The record is void of any direct link between B&M USA and B&M—likely because the plaintiff did not argue, let alone try to allege or establish, this factual issue. Although the contract contemplates that B&M may sell the licensed products through distributors, no specific distributors are listed, and there is no allegation or evidence that B&M USA is B&M's distributor. The only evidence is that B&M USA is the distributor for its parent company, which is a separate and distinct entity from B&M. Additionally, contrary to the dissent's assertion, the fact that B&M made sales to B&M USA in Washington does not create a reasonable inference that B&M USA was B&M's distributor of the licensed

products in Connecticut. There is no evidence or allegation that B&M sold the licensed products to B&M USA or that B&M USA then sold those products in Connecticut as B&M's distributor.[27] The plaintiff never sought to allege or prove that B&M USA is B&M's distributor. Cf. *Beverly Hills Fan Co.* v. *Royal Sovereign Corp.*, 21 F.3d 1558, 1565 (Fed. Cir.) (there were allegations in complaint that defendants purposefully shipped product into forum through established distribution channel), cert. dismissed, 512 U.S. 1273, 115 S. Ct. 18, 129 L. Ed. 2d 917 (1994).

The record also does not demonstrate that the plaintiff is part of B&M's distribution channel: the plaintiff never sought to show that it was part of that channel.[28] The contract specifically envisions that B&M will sell and distribute the licensed product. There is no reference in the contract to the plaintiff's marketing or selling the licensed products. The contract does not envision the plaintiff acting as part of any established distribution channel. In the absence of this connection, as we explain throughout this opinion consistent with binding precedent, the plaintiff's own conduct in the forum cannot serve as a basis for minimum contacts.

C

The dissent also asserts that B&M has received the protections of Connecticut law because of its ability to sue under CUTPA. The dissent is correct that foreign companies have been allowed to raise CUTPA claims against residents of the forum. What is unclear, and what the dissent provides no support for, is the proposition that this potential ability to bring a CUTPA claim means that any corporation that enters into a contractual agreement with a Connecticut resident avails itself of the protections of the forum. By this logic, any jurisdiction that has an unfair trade practices law has jurisdiction over any foreign corporation that enters into any contract with any resident. The plaintiff does not advance this debatable question of law in support of its minimum contacts claim. Additionally, even if we assume that the potential ability to raise a CUTPA claim creates minimum contacts, it is unclear whether a foreign corporation retains this ability when the contract it has negotiated contains a choice of law provision designating another jurisdiction's law as controlling. We are not aware of any decision by this court or the Appellate Court holding that a choice of law provision designating another forum's law as controlling nevertheless preserves a defendant's ability to bring a CUTPA claim.

D

Finally, the dissent asserts that the contractual provisions[29] regarding the plaintiff's right to inspect the products establish minimum contacts because they require B&M to ship products and advertising materials into

Connecticut for inspection on demand. The licensing agreement, however, requires only that B&M provide the plaintiff with sample products and advertising materials, and allows the plaintiff to inspect its products. The licensing agreement does not specifically require B&M to send anything to Connecticut. But "[w]here else" other than Connecticut, the dissent demands? "Exactly the point" is our answer. B&M only would have had to send these products and materials to Connecticut as a byproduct of the plaintiff's being located in Connecticut, not because B&M purposefully sought to avail itself of the forum. As with the royalty reports, under the terms of the contract, B&M would have been required to send these materials to wherever the plaintiff was located. This is precisely what case law defines as "ancillary" or "fortuitous" contacts. Additionally, the fact that the plaintiff may inspect those products in Connecticut is not relevant to our minimum contacts analysis, as that involves the plaintiff's own contacts with the forum, not the defendant's contacts. See, e.g., *Walden* v. *Fiore*, supra, 571 U.S. 290–91.

The judgment is affirmed.

In this opinion ROBINSON, C. J., and PALMER, McDONALD and MULLINS, Js., concurred.

* The listing of justices reflects their seniority status on this court as of the date of oral argument.

** August 20, 2021, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] "GmbH" stands for "Gesellschaft mit beschränkter Haftung," which, in German, means "company with limited liability." (Internal quotation marks omitted.) *TMT North America, Inc.* v. *Magic Touch GmbH*, 124 F.3d 876, 879 n.1 (7th Cir. 1997).

[2] The plaintiff has not argued in this court that B&M USA is a subsidiary or agent of B&M.

[3] It is unclear from the record when the assignment occurred, except that it happened sometime prior to the execution of the October, 2000 licensing agreement.

[4] B&M's license was exclusive as to some products and nonexclusive as to others.

[5] As to Emeram, the plaintiff's sole theory of liability is that it is the alter ego of B&M. The plaintiff's claim that specific jurisdiction exists as to Emeram depends, therefore, on whether jurisdiction exists as to B&M. Even if we assume that Emeram were the alter ego of B&M, our conclusion that the exercise of specific jurisdiction over B&M does not comport with principles of due process compels the same conclusion as to Emeram.

[6] Although the trial court's statement could be read to suggest that it interpreted *Bristol-Myers Squibb Co.* to establish a new standard for specific jurisdiction, in subsequently denying the plaintiff's motion to reargue or to reconsider the judgment of dismissal, the court made clear that it had not done so. Specifically, the trial court explained that its decision "did not turn on a belief that the [United States] Supreme Court changed the basic underlying applicable standard. Instead, the [trial] court relied on the court's latest articulation of it."

[7] Despite determining that there were insufficient minimum contacts to comport with due process, the trial court concluded that the defendants' contacts with the forum "likely" satisfied the long arm statute, § 52-59b. Although the plaintiff acknowledges that whether there are sufficient contacts to satisfy the long arm statute and due process are two distinct issues, it argues that it is " 'rare' " for a defendant's contacts with a forum to satisfy the long arm statute but not due process. Even if the plaintiff were correct that such an occurrence is rare, we are aware of no rule holding that, if the state's long arm statute is satisfied, due process likewise is satisfied. Additionally, because the parties do not dispute on appeal the trial court's conclusion that the long arm statute is likely satisfied, we do not address

this issue.

[8] Because the plaintiff's argument in favor of specific jurisdiction rests on the contractual relationship between the parties, the relatedness prong does not turn on the location of the actions that constitute the breach of the contract. To the contrary, as long as the cause of action arises from a contractual relationship that establishes sufficient minimum contacts with the forum, the relatedness prong is satisfied. See *Burger King Corp.* v. *Rudzewicz*, 471 U.S. 462, 482–83, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985); id., 483 (breach of contract claim brought by resident plaintiff that entered into contract with nonresident defendant is one that is "related to the contacts that [the defendant] established" in forum state (internal quotation marks omitted)). Accordingly, because *Bristol-Myers Squibb Co.* v. *Superior Court of California*, supra, 137 S. Ct. 1773, relied on by the defendants, involved tort claims, it is not helpful in the determination in the present case of whether the plaintiff's cause of action arose out of the alleged Connecticut contacts.

[9] Because we conclude that the plaintiff failed to demonstrate that B&M has created sufficient minimum contacts with Connecticut such that a Connecticut court's exercise of specific jurisdiction over B&M comports with due process, we do not consider whether jurisdiction would be reasonable. See, e.g., *Vetrotex CertainTeed Corp.* v. *Consolidated Fiber Glass Products Co.*, 75 F.3d 147, 154 n.9 (3d Cir. 1996).

[10] Although *Walden* was a torts case, not a breach of contract case, *Walden* makes abundantly clear when discussing this requirement that the focus on the defendant's contacts applies in contract cases not only because it cites to *Burger King*, a breach of contract case, but also because it is consistent with the analysis in *Burger King. Walden* v. *Fiore*, supra, 571 U.S. 284; see also *Burger King Corp.* v. *Rudzewicz*, supra, 471 U.S. 475 ("[j]urisdiction is proper . . . [when] the contacts proximately result from *actions by the defendant himself* that create a 'substantial connection' with the forum [s]tate" (emphasis altered)); *U.S. Bank National Assn.* v. *Bank of America N.A.*, 916 F.3d 143, 151 (2d Cir. 2019) (applying *Walden* to contract case and requiring focus to be on defendant's contacts with forum); *InfoSpan, Inc.* v. *Emirates NBD Bank PJSC*, 903 F.3d 896, 902–903 (9th Cir. 2018) (The court cited *Walden* and *Burger King* in explaining that, in contracts case, "[t]wo principles animate the defendant-focused [minimum contacts] inquiry. . . . First, the relationship between the nonresident defendant, the forum, and the litigation must arise out of contacts that the defendant himself creates with the forum [s]tate. . . . Second, the minimum contacts analysis examines the defendant's contacts with the forum [s]tate itself, not the defendant's contacts with persons who reside there. . . . It follows that a defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction." (Citations omitted; internal quotation marks omitted.)); *Gulf Coast Bank & Trust Co.* v. *Designed Conveyor Systems, L.L.C.*, 717 Fed. Appx. 394, 399 (5th Cir. 2017) (applying *Walden* to breach of contract claim).

[11] The facts of the present case—involving a licensing agreement between a resident plaintiff and a foreign national defendant—are hardly unique to Connecticut. It is therefore remarkable that, on this federal constitutional question, the parties have provided so little out-of-state guidance. Our research, like that of the dissent, reveals that it is plentiful.

[12] The dissent notes that courts have held there to be insufficient minimum contacts in cases involving contracts for onetime product sales or short-term service contracts. That is correct. These holdings, however, do not stand for the proposition that, when a contract is for an ongoing relationship, there automatically are sufficient minimum contacts. The existence of one does not require the exclusion of the other.

[13] The dissent contends that this footnote does not relate to the minimum contacts analysis because of where it "appears" in the opinion. The language of the footnote belies this argument, however. Specifically, it states that "[s]ome franchises may . . . involve different [decision-making] structures, such that a franchisee should not *reasonably anticipate out-of-state litigation*." (Emphasis added.) *Burger King Corp.* v. *Rudzewicz*, supra, 471 U.S. 485 n.28. This "reasonably anticipate out-of-state litigation" language relates to the minimum contacts inquiry. Id., 474.

[14] In addition to its reliance on *Burger King*, the dissent asserts that the Supreme Court similarly held in *McGee* v. *International Life Ins. Co.*, 355 U.S. 220, 222, 78 S. Ct. 199, 2 L. Ed. 2d 223 (1957), that minimum contacts exist when "a defendant knowingly entered into a long-term relationship with a forum resident . . . even when the defendant's contacts with the

forum state were limited to that one relationship and even when they fully depended on the fact that the plaintiff happened to reside in the forum." *McGee*, however, is distinguishable, as it involved a life insurance contract under which the defendant offered to insure the plaintiff's decedent, a California resident, in California. Moreover, *McGee* predates *Burger King* and *Walden*.

The dissent also relies on the more recent case of *Ford Motor Co.* v. *Montana Eighth Judicial District Court*,    U.S.    , 141 S. Ct. 1017, 209 L. Ed. 2d 225 (2021). *Ford Motor Co.*, however, specifically cites to the portion of *Walden* v. *Fiore*, supra, 571 U.S. 277, that explains that "[the court's] 'minimum contacts' analysis looks to the defendant's contacts with the forum [s]tate itself, not the defendant's contacts with persons who reside there. . . . Accordingly, [the court has] upheld the assertion of jurisdiction over defendants who have purposefully 'reach[ed] out beyond' their [s]tate and into another by, for example, entering a contractual relationship that 'envisioned continuing and [wide reaching] contacts' in the forum [s]tate . . . ." (Citations omitted.) Id., 285; see *Ford Motor Co.* v. *Montana Eighth Judicial District Court*, supra, 1025.

[15] Plainly, Connecticut has a general interest in "providing a forum in which [its] residents can seek redress for injuries caused by out-of-state actors." (Internal quotation marks omitted.) *Benton* v. *Cameco Corp.*, 375 F.3d 1070, 1079 (10th Cir. 2004), cert. denied, 544 U.S. 974, 125 S. Ct. 1826, 161 L. Ed. 2d 723 (2005). However, consideration of the impact of this court's constitutional determination of minimum contacts on this state's businesses and its economy is not appropriate. This is especially so when the parties have the freedom to contract, including the freedom to negotiate the inclusion of a forum selection clause in their agreement. See *Burger King Corp.* v. *Rudzewicz*, supra, 471 U.S. 472 n.14.

[16] Even if we assume that the contacts of B&M's predecessor may be attributed to B&M, we conclude that the plaintiff still has failed to satisfy its burden of establishing minimum contacts. We observe, however, that there appears to be a split of authority regarding whether a nonresident predecessor's minimum contacts may be imputed to a nonresident defendant in all cases or only in certain circumstances. See, e.g., *Patin* v. *Thoroughbred Power Boats, Inc.*, 294 F.3d 640, 653 (5th Cir. 2002) (jurisdictional contacts of predecessor corporation may properly be imputed to its successor corporation, consistent with due process); *Williams* v. *Bowman Livestock Equipment Co.*, 927 F.2d 1128, 1132 (10th Cir. 1991) (court may impute predecessor's contacts to successor only if forum law would hold successor liable for actions of its predecessor); *Gentry* v. *Kaltner*, Docket No. 17-CV-8654 (KMK), 2020 WL 1467358, *7 (S.D.N.Y. March 25, 2020) (predecessor's contacts may be imposed on defendant only when successor liability is established); *Berninger* v. *Amada America*, Inc., Docket No. 1:06-CV-886 (FJS/RFT), 2008 WL 4518739, *3 (N.D.N.Y. September 30, 2008) ("in certain circumstances, a defendant can inherit its predecessor's jurisdictional status, although it is not clear whether minimum contacts are one of those circumstances"); *Huth* v. *Hillsboro Ins. Management, Inc.*, 72 F. Supp. 2d 506, 511 n.4 (E.D. Pa. 1999) ("[p]laintiffs must be permitted to establish jurisdiction over successor corporation based [on] its predecessor's contacts with the forum" (internal quotation marks omitted)).

[17] The dissent also asserts that B&M purposefully availed itself of the benefits of Connecticut law because Connecticut law "helped to ensure . . . the ability of [the plaintiff] to carry out its everyday business functions and contractual performance on which B&M's contract relied." As explained throughout this opinion, however, the plaintiff's performance in the forum is not relevant to whether sufficient minimum contacts exist to support personal jurisdiction.

[18] Contrary to the dissent's assertion, we never state that it is difficult to establish minimum contacts in the absence of the defendant's initiation of contact or that the issue of initiation is dispositive. We mention the issue of which party initiated the contract merely as an example of a factor case law indicates a plaintiff might rely on to help sustain its burden of proof that a defendant has reached into the forum. The plaintiff in the present case has not sought to make this argument or to advance such evidence.

[19] We recognize that the dissent cites to other cases that have held that a single visit to the forum can weigh in favor of jurisdiction. However, in all of the federal court of appeals cases the dissent cites, the visit to the forum by the defendant or one of its employees either was essential to the underlying contract (e.g., training regarding the products at issue) or led to or involved negotiation of the contract at issue. This leaves the dissent with

only district court and state court cases to support its view that a single visit to the forum, which was not necessary for the fulfillment of the contract, nonetheless suffices to establish minimum contacts. Those cases are at odds with the federal court of appeals decisions in *Sneha Media & Entertainment, LLC*, *Moncrief Oil International, Inc.*, *CEM Corp.* and *R.L. Lipton Distributing Co.* that we have cited.

In the present case, we know very little about Marchand's single visit to Connecticut, which occurred after the parties had negotiated and executed the licensing agreement, and was not required for B&M's performance of the agreement. Cf. *Bell Paper Box, Inc.* v. *U.S. Kids, Inc.*, 22 F.3d 816, 819–20 (8th Cir. 1994) (single visit to forum weighs in favor of jurisdiction when contract performance occurs solely in forum state). In light of the scarcity of evidence about the purpose of the visit, and consistent with the case law we cite, we cannot conclude that this visit to the forum was anything other than ancillary and of little significance. Thus, despite the parties' long-term contractual relationship, B&M's physical presence in the forum was insubstantial and sporadic at best, with only one visit to the forum, which distinguishes the present case from those that involve long-term contractual relationships in which other substantial contacts existed or arose during the course of the parties' relationship.

[20] Although the plaintiff appears to rely on exhibits that concern this meeting with Mistral Sports Group, the record does not make clear the precise relationship between Mistral Sports Group and NSW.

[21] Similarly, the dissent relies heavily on the fact that "B&M made a voluntary, informed choice to enter into a long-term contractual relationship with [the plaintiff], and it did so knowing full well that [the plaintiff] would perform its principal obligations under the contract—including filing, processing, maintaining, and protecting the parties' rights to and the value of the North Marks trade name—from its headquarters in Milford."

[22] The dissent disagrees that these cases require the coupling of other significant contacts with continuous communications to establish minimum contacts, but the case law it relies on belies this point. For example, although the primary case on which the dissent depends, *Grand Entertainment Group, Ltd.* v. *Star Media Sales, Inc.*, 988 F.2d 476 (3d Cir. 1993), did rely, in part, on communications between the parties in determining that jurisdiction exists, those were not the only contacts with the forum. See id., 482–83. In addition to twelve communications by the defendants to the forum and more than fifty additional communications between the parties' agents within a short period of time, the defendants "engaged in negotiations for an agreement that would have created rights and obligations among citizens of the forum and contemplated significant ties with the forum." Id. As explained throughout this opinion, the contract in the present case did not envision or require significant ties with Connecticut or significant oversight by the plaintiff from Connecticut.

[23] The contention by the plaintiff and the dissent that B&M knew that this money would be used by the plaintiff in Connecticut is unavailing. As discussed, the actions of the plaintiff are irrelevant to our minimum contacts analysis. See, e.g., *Walden* v. *Fiore*, supra, 571 U.S. 289. Additionally, the fact that the plaintiff resided in the forum was "fortuitous" under the case law and does not show that B&M was intentionally reaching into the forum, especially when it did not send the payments to the forum.

[24] The plaintiff argued, at least by implication, that there were minimum contacts because the parties entered into a carefully structured contractual relationship. Specifically, the plaintiff cited and quoted *Burger King*; *Burger King Corp.* v. *Rudzewicz*, supra, 471 U.S. 480 (specific jurisdiction existed when defendant "entered into a carefully structured [twenty year] relationship that envisioned continuing and [wide reaching] contacts with [the plaintiff] in [the forum state]"); after arguing that the parties entered into a contract that required the plaintiff to perform in Connecticut.

[25] For example, as discussed in more detail in footnote 27 of this opinion, B&M offered evidence to refute the plaintiff's allegation that B&M USA was its agent or subsidiary. The plaintiff offered no counterevidence, and, thus, this issue was not in dispute. Only if the plaintiff had offered counterevidence on this issue would it be deemed in dispute, thereby requiring either an evidentiary hearing or application of the prima facie standard to *that* factual issue. Thus, in the present case, in which B&M offered evidence on an issue of fact and the plaintiff failed to offer countering evidence, no jurisdictional facts are in dispute, and the prima facie standard does not apply. The plaintiff merely has failed to satisfy its burden.

[26] We note that B&M has never stated that B&M USA sold *the licensed*

*products* in Connecticut. Rather, citing to the affidavit of its parent company's chief executive officer, Till Eberle, it represented only that B&M USA sold a small percentage of product (0.006% of its total sales) in Connecticut. In the same affidavit, Eberle averred that B&M USA distributed various branded products in Canada and the United States, including multiple different product lines. Thus, it is not clear if the licensed products at issue in the present case were the products sold in Connecticut by B&M USA, and the plaintiff has failed to advance any allegations or to offer any evidence that would allow this court to attribute B&M USA's forum contacts to B&M. Thus, this arguably ambiguous fact need not be resolved for purposes of deciding this case.

Additionally, we see no reason to respond to the dissent's legal argument for attributing B&M USA's sales in Connecticut to B&M—the so-called "stream of commerce" theory. First, the plaintiff has not advanced this theory either in the trial court or on appeal, and B&M has not had a chance to brief whether this doctrine should apply in the present case. Second, the contours of this theory are far from clear. See *Beverly Hills Fan Co.* v. *Royal Sovereign Corp.*, 21 F.3d 1558, 1566 (Fed. Cir.) (explaining that there exists split of authority over exact requirements for application of stream of commerce theory, with some jurisdictions requiring more than merely placing product in stream of commerce while others do not require additional conduct), cert. dismissed, 512 U.S. 1273, 115 S. Ct. 18, 129 L. Ed. 2d 917 (1994).

[27] The plaintiff could have set forth allegations and offered evidence to establish that B&M USA and B&M were involved in an agency or alter ego relationship, thereby imputing the forum contacts of B&M USA to B&M. See *Dickson Marine, Inc.* v. *Panalpina, Inc.*, 179 F.3d 331, 338–39 (5th Cir. 1999) (declining to ignore corporate form and to attribute contacts of company to foreign sister entity when one was not parent of other, one does not control other, and there was no evidence of existence of agency relationship). The plaintiff, however, set forth no allegations in this regard and failed to offer any competing evidence to refute B&M's evidence that there was no agency relationship. Thus, there is no evidence on this record that B&M USA was B&M's agent.

[28] Here again, the dissent will not hold the plaintiff to its burden of proof and generalizes about the applicability of distinguishable case law. Specifically, the dissent broadly asserts that, "[u]nder the [parties'] licensing agreement, B&M acquired the right to use North Sails' valuable, market leading trade name to advertise and promote B&M's own products. And, when B&M markets and sells its products in a state using the North Sails trade name, that is about as *fundamental of a contact as there can be*. B&M is reaching out to Connecticut consumers, displaying the brand here, and staking a claim against anyone else who might try to use the brand in Connecticut without authorization, all while *earning royalties on Connecticut sales* for North Sails." (Emphasis added.) Although sales by a defendant in the forum might arguably constitute a fundamental contact with the forum, no such fundamental contact occurred here. Even when we construe the allegations and evidence in the light most favorable to the plaintiff, we conclude that it has failed to satisfy its burden in this respect. This is the danger of advancing arguments the parties do not advance: the record was not built by either side with this argument in mind.

[29] The dissent also relies on the fact that the licensing agreement obligates B&M to assist the plaintiff, should the latter either initiate or be drawn into litigation regarding North Marks, and requires B&M to indemnify and defend the plaintiff under certain circumstances. Neither party raised this argument, and, thus, we do not consider it. Nevertheless, we note that the case on which the dissent relies, *Samelko* v. *Kingstone Ins. Co.*, supra, 329 Conn. 249, is distinguishable in that this court held in *Samelko* that the duty to defend or assist in litigation provision of the insurance policy at issue created minimum contacts on the part of the defendant insurer because the underlying action stemmed from its alleged breach of this provision. Id., 272. In the present case, unlike in *Samelko*, the underlying action does not stem from B&M's duty to defend or assist in litigation.